UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GREGORY C. HAMRICK,       )
                                       )
           Plaintiff,       )
                                       )
      vs.                  )
                                       )     Case No. 4:04CV01343 AGF
JO ANNE B. BARNHART,      )
Commissioner of Social Security     )
Administration,               )
                                       )
          Defendant.     )

## MEMORANDUM AND ORDER

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security, denying Plaintiff Gregory Hamrick's application for

Supplemental Security Income (SSI), under Title XVI of the Social Security Act (SSA),

42 U.S.C. §§ 1381, et seq.[1]  For the reasons set forth below, the Court will reverse the

decision of the ALJ and remand this case for further consideration.

Plaintiff, who was born on September 24, 1953, applied for SSI benefits on

April 15, 2002, alleging that he was unable to work due to congestive heart failure,

essential hypertension, knee problems, depression, shortness of breath, fatigue, and

edema.  Tr. 108-12, 160.  In his application, Plaintiff alleged a disability onset date of

April 1, 1997; on his Disability Report accompanying the application, he alleged a

disability onset date of September 1998.  In a brief to the agency, Plaintiff's counsel

---

[1]    The parties have consented to the exercise of authority by the undersigned United
States Magistrate Judge under 28 U.S.C. § 636(c).

added cardiomyopathy and level III "extreme" obesity to Plaintiff's impairments. Tr. at 118. After Plaintiff's application was denied at the initial administrative level, he requested a hearing before an Administrative Law Judge (ALJ). A hearing, at which Plaintiff appeared with counsel, was held on March 27, 2003. The ALJ issued his decision on September 23, 2003, finding that Plaintiff was not disabled. On August 4, 2004, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. Plaintiff has thus exhausted all administrative remedies, and the ALJ's decision stands as the final agency action.

Plaintiff argues that the ALJ's decision is based upon legal error and is not supported by substantial evidence in the record. Specifically, Plaintiff argues that the ALJ erred in (1) failing to give Plaintiff's treating cardiologist's opinions controlling weight; and (2) relying on the testimony of a vocational expert (VE) in response to a faulty hypothetical question, which failed to properly set forth Plaintiff's impairments. Plaintiff asks the Court to reverse the decision of the Commissioner and grant him benefits commencing April 24, 2002, or alternatively, to reverse and remand the case to the Commissioner for a rehearing.

## BACKGROUND

### Work Record

According to Plaintiff's work history report, he was employed in auto sales from June 1987 to September 1990. From June 1991 to November 1991, he was employed in sales and promotions for an auto advertising and promotions business. In July 1993

Plaintiff began working in vacuum cleaner sales. He reported that he worked part time in 1998 and stopped working in September of that year. Tr. at 151, 160. Plaintiff's earnings record covering years 1969 through 1991 shows sporadic and sparse earnings, with no earnings in 1973, from 1975 through 1980, nor in 1985. Tr. at 104.

**Medical Record**

Plaintiff saw cardiologist Subrodh Mehra, M.D., for a periodic history and physical on October 16, 2000. Plaintiff, who was 6 feet 3½ inches tall, weighed 372 pounds, and his blood pressure was 160/100.[2] In check-box format, Dr. Mehra indicated that Plaintiff was within normal limits in all physical categories, but noted Plaintiff's history of cardiomyopathy (disease of the heart muscle) and congestive heart failure. Dr. Mehra prescribed Captopril (used to treat high blood pressure and heart failure). Tr. at 188-90.

On November 3, 2000, Plaintiff was admitted to St. Anthony's Medical Center in St. Louis, Missouri, with chest discomfort and increasing shortness of breath. He complained of pain that started as waves in the middle of his abdomen, then extended to his right upper quadrant; he also suffered from profuse sweating and nausea. Plaintiff reported that the pain would last for a few hours and then dissipate. Tr. at 205. A chest exam revealed a slight pulmonary venous congestion and enlargement of the heart, with a

---

[2]   The American Heart Association has set a reading of 115/75 as the point at which the risk of cardiovascular complications increases. http://www.americanheart.org

small right pleural effusion, findings which were considered consistent with cardiac decompensation.  Tr. at 221.

Upon admission, Plaintiff was examined by Dilip H. Patel, M.D., who noted Plaintiff's history of heart failure starting in 1996 when he was treated at St. Luke's Hospital, after which he was maintained on medication.  Dr. Patel wrote that Plaintiff reported that his legs had been swollen considerably for about a month.  A physical examination showed marked swelling and pitting edema[3] in the abdomen, in addition to marked swelling in Plaintiff's lower extremities.  Dr. Patel reported than an electrocardiogram suggested an old anteroseptal infarct (heart attack).  He concluded that Plaintiff had an old dilated cardiomyopathy that had been exacerbated; and elevation of liver function, probably related to fatty infiltration of the liver.  Dr. Patel recommended aggressive diuresis and increasing doses of beta blockers[4] and ACE inhibitors.[5]  Tr. at 209-10.

Dr. Patel reported that clinical tests indicated that Plaintiff's left atrium and left ventricular cavity were both moderately enlarged, with diffuse hypokinesia (diminished or slow movement).  Dr. Patel noted that Plaintiff had an ejection fraction of 22 percent,[6]

---

[3]    An edema that retains for a time the indentation produced by pressure.  Stedman's Medical Dictionary 544 (26th ed. 1995) (Stedman's).

[4]    A class of medications used in the treatment of cardiovascular diseases. http://www.MayoClinic.com.

[5]    A class of drugs used in the treatment of hypertension.  Stedman's 873.

[6]    The percentage of blood that is pumped out of a filled ventricle with each heartbeat. A normal ejection fraction is between 55 and 70 percent, which may decrease when the

and that his mitral valve motion appeared mildly diminished.  Dr. Patel opined that

Plaintiff had  "[m]oderately dilated cardiomyopathy with severe diffuse left ventricular

wall motion abnormalities."  In addition, Dr. Patel concluded that Plaintiff had moderate

to severe left atrial enlargement with moderate mitral regurgitation (valve insufficiency),

as well as moderate tricuspid regurgitation with moderate pulmonary hypertension.  Tr. at

195.  A second chest exam on November 6, 2000, again showed right pleural effusion; no

pulmonary congestive change was observed.  Tr. at 222.

On November 7, 2000, Plaintiff was examined by A. Rashid Qureshi, M.D., who

found Plaintiff to be in severe congestive heart failure.  Plaintiff's blood pressure was

100/80 and his pulse was 70.  Dr. Qureshi noted that Plaintiff's abdomen was markedly

distended with ascites,[7] and that he had marked edema in both feet.  Tr. at 223.

During Plaintiff's hospital stay, he lost a significant amount of weight,[8] and his

shortness of breath improved.  He was discharged on November 8, 2000, and directed to

continue treatment with Dr. Mehra.  In a discharge summary prepared by Dr. Patel,

Plaintiff's principal diagnosis was congestive heart failure, and his secondary diagnoses

included cardiomyopathy, cellulitis of the leg, and essential hypertension.  Additionally,

Plaintiff was diagnosed with mitral valve disorder, tricuspid valve disease, chronic

_____

heart muscle has been damaged.  http://www.MayoClinic.com.

[7]    Accumulation of serous (of or relating to serum or substance with a watery
consistency) fluid in the peritoneal cavity.

[8]    The hospital record lists a weight loss of 80 pounds during this five-day period (Tr.
208), but a review of subsequent treatment records suggests this may be an error.

pulmonary heart disorder NEC (not elsewhere classified), and cardiac dysrhythmias NEC. Tr. at 198, 208.

On November 22, 2000, Plaintiff saw Dr. Mehra for a hospital follow-up. Dr. Mehra noted that Plaintiff was breathing much better and watching his diet, and had lost 30 pounds in two weeks. Dr. Mehra prescribed Captopril and Metoprolol (for high blood pressure), Lasix (for fluid retention), Spironolactone (for high blood pressure and fluid retention), and Lanoxin (for heart failure). Tr. at 190. Plaintiff returned on February 2, 2001, weighing 350 pounds. His blood pressure was 144/90. Dr. Mehra noted that Plaintiff complained of fatigue on exertion, but that he had no shortness of breath or chest pain. Dr. Mehra increased Plaintiff's Captopril dosage and refilled Plaintiff's other prescriptions. On April 6, 2001, Plaintiff weighed 350 pounds and reported to Dr. Mehra that he was walking one mile per day. He reported no chest pain, but did assert shortness of breath on exertion. His blood pressure was 132/80 and he had 2+ leg edema. Dr. Mehra advised him to adhere to a diet.

Plaintiff weighed either 350 or 361 pounds at his June 20, 2001 follow-up appointment with Dr. Mehra. According to Dr. Mehra's notes, Plaintiff walked one mile per day and experienced no chest pain or shortness of breath. Plaintiff's blood pressure was 128/70. Dr. Mehra noted that Plaintiff was not adhering to his diet and counseled Plaintiff about this. Plaintiff's prescriptions remained the same. Tr. at 186.

Plaintiff returned to Dr. Mehra on February 21, 2002, with a home blood pressure range of 135-160/75-90. Dr. Mehra indicated that Plaintiff's weight was stable and again

noted that Plaintiff walked one mile per day. In an echocardiogram summary dated March 8, 2002, Dr. Patel reported a mildly dilated left ventricle with minimal hypokinesia and an ejection fraction of 40 percent by one test and 54 percent by another test; impaired left ventricle relaxation; and mild to moderate left atrial enlargement. Tr. at 194.

Dr. Mehra saw Plaintiff again on May 1, 2002. Plaintiff weighed over 350 pounds and reported that his weight two weeks prior had been 368 pounds. Dr. Mehra recorded that Plaintiff walked every morning, and that his breathing was fair. The record indicated that Plaintiff had no paroxysmal nocturnal dyspnea (PND) (shortness of breath after lying down - a symptom of congestive heart failure). Plaintiff's blood pressure was 124/80. Dr. Mehra noted the presence of 1+ leg edema and recommended that Plaintiff decrease his salt intake. Tr. at 186.

In a pain questionnaire completed by Plaintiff on May 10, 2002, Plaintiff stated that he occasionally experienced sharp pain in his chest and back as a result of stress or physical exertion. Plaintiff asserted that he avoided activities such as bending, squatting, stooping, reaching, and standing. He stated that to relieve the pain he would sit and rest, and that generally "avoidance of activity and stress keeps [him] feeling okay." He stated that the congestive heart failure was what kept him from "doing things," and that if he tried to proceed normally he would "probably have a heart attack and die." Tr. at 133.

At a follow-up appointment with Dr. Mehra on July 10, 2002, Plaintiff was documented as weighing 362 pounds. Dr. Mehra noted that Plaintiff was "generally

stable," that his breathing was fair, that he did not suffer from PND, that his blood pressure was 132/84, and that he had leg edema. Tr. at 170.

Consulting physician Saul Silvermintz, M.D., examined and evaluated Plaintiff on August 15, 2002, in connection with his application for disability benefits. Plaintiff's chief complaints were congestive heart failure, knee problems, and depression. Dr. Silvermintz declined to discuss the complaint of depression. Dr. Silvermintz reviewed Plaintiff's history of congestive heart failure, noting that because Plaintiff could not give specific details, it was difficult to make a thorough assessment. Plaintiff stated that walking up stairs caused him to feel weak, sweaty, and short of breath. Plaintiff reported that he thought he could walk two to four blocks on some days, half a mile on other days, and only 100 yards on some days. Dr. Silvermintz reiterated that he had no records and could not elicit specific symptoms from Plaintiff. Tr. at 177.

Dr. Silvermintz then assessed Plaintiff's complaints of knee problems. Plaintiff claimed that his knees hurt and swelled up when he supported his weight on them for too long, went up steps, or bent down and straightened up. He stated that he had received no therapy or prescriptions for these problems. Dr. Silvermintz listed Plaintiff's medications as Spironolactone and Chlorthalidone (for high blood pressure and water retention), Metoprolol, Lasix, Digoxin (for heart failure), Captopril, and aspirin. Dr. Silvermintz noted that Plaintiff was markedly overweight, and that his heart percussed out to the left as being enlarged. An examination showed 1+ edema in both of Plaintiff's legs from the

ankles to the knees.  Dr. Silvermintz's impression was a history of congestive heart failure that was "not in failure at this time," and morbid obesity.  Tr. 177-79.

Plaintiff returned to Dr. Mehra's office on September 11, 2002, weighing 362 pounds.  His blood pressure was 120/78.  On January 7, 2003, he weighed 357 pounds and his blood pressure was 122/80.  Dr. Mehra noted that Plaintiff was feeling good, his breathing was fair, he had no chest pain, and he walked one mile per day.  Tr. at 169.

A physical RFC assessment prepared by Social Security determinations counselor/case manager Katrice Kendle on August 23, 2002, indicated in check-box format that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry ten pounds; stand and/or walk and sit for about six hours in an eight-hour workday; and that his ability to push and/or pull was unlimited.  Ms. Kendle indicated that Plaintiff could only climb (ramps, stairs, ladder, rope, scaffolds) occasionally; could balance, stoop, kneel, crouch, and crawl frequently; and had no manipulative, visual, communicative, or mental limitations.  Tr. at 138-45.

Ms. Kendle's handwritten notes on the RFC form are essentially illegible.  In "case action notes" also dated August 23, 2002, Ms. Kendle wrote that there did not appear to be evidence of work-related functional limitations from a possible mental impairment.  Tr. at 138-46.  Ms. Kendle signed the form as a "medical consultant," however, the records suggest that she was not a medical professional.

On a cardiac impairment RFC questionnaire dated February 26, 2003, Dr. Mehra wrote that he had been treating Plaintiff since October 2000, seeing him every three

9

months.  Dr. Mehra diagnosed Plaintiff as having cardiomyopathy with congestive heart failure and a class III heart.[9]  Dr. Mehra listed Plaintiff's symptoms as marked dyspnea (shortness of breath), leg edema, fatigue, and weakness.  He indicated that Plaintiff was not a malingerer, that stress played a minimal role in Plaintiff's symptoms, and that Plaintiff could handle moderate stress.  He further noted that Plaintiff had "periods of anxiety, particularly associated with dyspnea and fatigue."  Tr. at 173

Dr. Mehra also indicated that emotional factors contributed to the severity of Plaintiff's subjective symptoms and functional limitations, and that the combination of Plaintiff's physical and emotional impairments could reasonably be expected to produce the  subjective symptoms and functional limitations noted.  In the space asking for an explanation, Dr. Mehra wrote, "Fatigue and lack of ability to perform ADL [activities of daily living]."  Plaintiff was noted as showing good improvement as a result of his medications; his prognosis was labeled as "guarded."  Dr. Mehra opined that Plaintiff's symptoms could be expected to last at least 12 months.  Dr. Mehra stated that Plaintiff could walk four city blocks without rest or severe pain; and that in an eight-hour workday, Plaintiff could walk for less than two hours, stand for about two hours, and sit for about four hours.  Dr. Mehra indicated that Plaintiff could not get through an eight-hour workday without lying down for two to three hours, and that Plaintiff should elevate

---

[9]    Class I refers to patients with cardiac disease but without resulting limitations of physical activity; Class II refers to patients with cardiac disease resulting in slight limitation of physical activity; Class III refers to patients with cardiac disease resulting in marked limitations on physical activity; and Class IV refers to patients with cardiac disease resulting in inability to carry on any physical activity without discomfort. http://www.hcoa.org/hcoacme/chf-cme/chf00070.htm

his legs while sitting. Dr. Mehra indicated that Plaintiff could occasionally lift ten pounds, but never more than that; that Plaintiff could not bend and twist; and that his impairments or treatment could be anticipated to cause Plaintiff to be absent from work more than twice a month. Tr. at 174-75.

**Evidentiary Hearing**

Plaintiff, his ex-wife, a medical expert (ME), and a VE testified at the evidentiary hearing held on March 27, 2003. Plaintiff testified that he last worked in September 1998, when he worked for Kirby Vacuum Sales in sales management. He testified that he had been in the hospital a couple of times in the previous four or five years for heart problems, and that he had been diagnosed with congestive heart failure, which was his reason for quitting work. Tr. at 30-31.

Plaintiff testified that from November 3 to 8, 2000, he was hospitalized at St. Anthony's due to heart failure, as well as a possible gallbladder problem and another condition Plaintiff could not remember. He testified that after that hospitalization, he began treatment with Dr. Mehra twice a month. The frequency of the appointments decreased as time went on, depending on Plaintiff's condition. Plaintiff testified that he sometimes experienced fatigue; profuse sweating; ankle, knee, and calf swelling; and shortness of breath exacerbated by extreme weather. He testified that sitting made him uncomfortable, and that elevating his legs and taking prescription diuretics alleviated this discomfort. Plaintiff testified that he was taking the medications listed on his medication

list, which included Carthalid, Spironolactone, Lanoxin, Lasix, Captopril, and Metoprolol. Tr. at 31-33, 116.

In describing how he spent an average day, Plaintiff testified that he usually got up at 6:00 a.m. after having gone to bed between 7:30 and 8:00 p.m. the night before. He testified that during the night he usually woke up around midnight to go to the bathroom because of the diuretics, and that he had a fitful sleep the rest of the night. Plaintiff testified that after he woke up in the morning, he usually did small chores around the house, had coffee and toast, and took his medication along with 22 ounces of water. Plaintiff testified that after breakfast he usually washed his place setting of dishes and bagged up the trash. A couple of times a week he set the trash by the back door instead of taking it out to the dumpster because he did not feel well enough to carry it that distance. He then made the bed, bathed, and got dressed. After that he was usually tired, so he rested by sitting with his feet elevated and watched TV for an hour. Plaintiff testified that he had lunch, and then if he was feeling well he took the bag of trash out to the dumpster. If he did not feel well, he remained seated with his feet elevated, watching TV. (Tr. at 33-37)

Plaintiff testified that he usually took a nap around 3:00 p.m., followed by a quarter-mile walk around his trailer court if he felt up to it. He testified that he usually had to stop at least once during the walk, and then rest again afterward. Plaintiff testified that he usually made a microwaveable dinner, then spent the evening watching TV, reading, or spending time with his ex-wife. He testified that he saw his ex-wife two or

12

three times a week, including times that she came to his house to check on him. Tr. at 37-38, 49.

Plaintiff testified that he could stand between 10 and 15 minutes before he became uncomfortable and had to sit. He described this discomfort as swelling in his ankles, sweating, and a general uncomfortable feeling. He testified that when he had to sit down, it would sometimes be for a few minutes and sometimes for half an hour. Plaintiff testified that he could stay seated with his feet on the floor for half an hour before he needed to elevate them. Plaintiff stated that Dr. Mehra advised him to keep his legs elevated. He testified that he never tried to walk further than the quarter-mile distance of the trailer court, and that climbing one flight of stairs caused sweating and fatigue. Plaintiff testified that Dr. Mehra advised him not to lift anything in excess of ten pounds unless absolutely necessary. Plaintiff testified that he currently weighed 362 pounds, and that he had weighed in the 290s three or four years prior, when he was working. Tr. at 38-40.

Plaintiff testified that he used to enjoy golf, softball, and bowling, but that he no longer did those activities. Instead, he left the house only to walk around the trailer park, grocery shop, pick up prescriptions, go to doctors' appointments, and visit his ex-wife. Plaintiff also testified to experiencing pain at times and having memory problems often. Tr. at 41.

In response to questioning by the ALJ, Plaintiff testified that he regularly drove five to six miles a day in an average week. He testified that, although his ex-wife drove

13

him the 20 minutes it took to get to the hearing that day, he could have driven the distance himself.   He testified that he was on Medicaid and received General Relief, which, until the month before the hearing, had been $80 per month, but had been reduced to $9 per month.  Plaintiff's highest level of education was an associate's degree in marketing.  Tr. at 43-44.

Plaintiff testified that Dr. Mehra had counseled him to eat less in order to lose weight and had recommended foods like soup and salad for lunch rather than fast food and a lot of meat.  Plaintiff testified that he followed Dr. Mehra's suggestions about fifty percent of the time.  Plaintiff testified that he usually walked once around the trailer park about three times a week, unless he felt really bad.  When asked about a notation in Dr. Mehra's report that Plaintiff walked a mile, Plaintiff responded that he did so once and reported it to Dr. Mehra because it was the farthest he had ever gone.  Plaintiff testified that when he carried ten pounds of weight from one end of a room to the other, he experienced sweating, shortness of breath, dizziness, and a strong need to sit.  He testified that he stopped playing golf in 1996 because he was too fatigued to do that in addition to working.  Tr. at 44-48.

Plaintiff testified that he shopped for groceries once a month, occasionally with his ex-wife, and that he did his own laundry.  He testified that he had vacuumed until the vacuum cleaner broke.  He visited his daughter, who lived across the street from him, a couple of times a month.  He testified that went out to eat or to the movies with his ex-wife a couple of times a month.  Tr. at 48-50.

The ME then testified that on November 3, 2000, when Plaintiff was admitted to St. Anthony's, he met listing 4.02 -- chronic heart failure -- of Commissioner's listing of impairments (20 C.F.R., part 404, Subpart P, Appendix 1), but that by March 8, 2002 (the date of Dr. Patel's electrocardiogram report showing an ejection fraction of 40 percent), Plaintiff had improved to the point where he no longer met that listing, although he still had cardiomegaly (enlargement of the heart).  Tr. at 53-55.

The ME noted that Dr. Mehra had reported that Plaintiff walked a mile per day on more than one occasion.  He testified that although the February 26, 2003 RFC questionnaire completed by Dr. Mehra listed Plaintiff's symptoms as marked dysphemia (shortness of breath), leg edema, and fatigue, Dr. Mehra also stated on the form that Plaintiff had shown good improvement.  The ME further stated that these symptoms were not recorded in the notes from Plaintiff's office visits.  The ME testified that Plaintiff's complaints of leg edema could be related to "potentially treatable things" other than Plaintiff's heart condition, such as venous insufficiency due to his excessive weight, but that the ME had no way to evaluate that.  Tr. at 55-56.

The ME testified that, based on Dr. Mehra's notes and Plaintiff's statements about fatigue, Plaintiff's heart would be closer to a class II than a class III.  He stated that, in spite of the lack of palpitations, dysphemia, or anginal pain, Plaintiff would still be class II because of his fatigue and cardiac disease.  The ME agreed with Dr. Mehra's February 2003 assessment of Plaintiff's limitations with regard to sitting, standing, and walking, but believed that the ability to perform activities of daily living was consistent with those

15

limitations. The ME testified that he could infer from the record that Plaintiff would have been limited in the same way in April 2002 when he filed his application for SSI benefits. Tr. at 56-58.

The ME testified that he did not see a medical indication for Dr. Mehra's assessment that Plaintiff could not get through an eight-hour workday without lying down for two to three hours. The ME agreed with the limitations on lifting assessed by Dr. Mehra, and testified that they would have been the same in April 2002. He testified that there would also be limitations on kneeling and crawling because of Plaintiff's excessive weight and history. He testified that there would be a limitation on exposure to climate extremes, and that Plaintiff should not climb any ladders or scaffolding. The ME testified, however, that he did not know how Plaintiff's condition would cause him to miss work more than twice a month. Tr. at 58-60.

The ALJ then asked the VE whether an individual with Plaintiff's vocational factors (age, education, training, and past relevant work experience), who was limited in an eight-hour workday to walking less than two hours, standing about two hours, sitting about two hours, and occasionally lifting and carrying no more than ten pounds, would be able to perform Plaintiff's past relevant work. The VE responded that he did not think so, because most of the jobs previously held by Plaintiff were all light work, which was beyond the hypothetical individual's abilities. The VE testified, however, that such an individual could work as an order clerk, credit card clerk, customer service representative,

general office worker, or in telephone sales--all sedentary jobs.[10]  He testified that there

were in excess of 100,000 such jobs in Missouri and over a million in the national

economy, and that Plaintiff's skills were transferrable to those jobs.  Tr. at 62-64, 70.

The VE testified that the need to elevate one's legs and lie down for two to three

hours during the day would preclude the performance of the jobs he identified.  The VE

also testified that missing work more than twice a month would cause one to lose one's

job within six to nine months of hiring.  The ALJ asked the ME if he saw a medical basis

for Plaintiff's need to elevate his legs.  The ME responded that Plaintiff had complained

of edema, but the ME had no way of ascertaining whether Plaintiff's weight or a heart

condition would be the cause of that.  He testified that there was no evidence in the

medical records to indicate heart failure at the present time.  The ME initially denied

seeing any reference to edema in the medical records, but then stated that he had only

been able to "take a quick look at the [records] submitted today."  After reviewing those

records, he testified that there were at least two notes referencing leg edema in the

records.  He testified that he would assume the edema was from some medically

determinable impairment, but that he would have no way of determining that from the

medical records.  Tr. at 65-67.

---

[10]    Sedentary work involves lifting no more than ten pounds at a time and occasionally
lifting or carrying articles like docket files, ledgers, and small tools.  Although a
sedentary job is defined as one which involves sitting, a certain amount of walking and
standing is often necessary.  20 C.F.R. § 404.1567(a).

Plaintiff's ex-wife testified that she saw Plaintiff two or three times a week. She testified that Plaintiff was not able to do things he had once been able to do around the house, such as hang curtain rods, because he would get dizzy and short of breath. Plaintiff's ex-wife testified that Plaintiff has a tendency to be stoic at doctors' appointments and not list many complaints, but from her observations, the limitations testified to by Plaintiff were accurate. Tr. at 68-69.

**ALJ's Decision**

The ALJ found that Plaintiff's cardiac enlargement, history of congestive heart failure, and obesity constituted a severe combination of impairments, but that since the filing of his application for SSI benefits, Plaintiff's impairments, individually or in combination, did not meet or medically equal the requirements of any of the impairments listed in Appendix 1. The ALJ noted that in making this determination, he considered Plaintiff's obesity by itself and in combination with Plaintiff's other impairments. Tr. at 18 -19.

The ALJ went on to consider Plaintiff's RFC in order to determine if Plaintiff could perform his past relevant work or other work. The ALJ first assessed the credibility of Plaintiff's allegations of disabling impairments under the framework set forth in Polaski v. Heckler, 751 F.2d 943 (8th Cir. 1984). The ALJ noted that there were few third-party observations corroborating the full extent of Plaintiff's complaints; that Plaintiff was rarely observed to be in acute distress; that Dr. Silvermintz reported on August 15, 2002, that Plaintiff was not in acute distress or discomfort; and that at the

hearing, Plaintiff had a "normal appearance and demeanor." The ALJ also noted that Plaintiff did not have a good work record to enhance the credibility of his allegations of disabling symptoms. The ALJ pointed to the lack of posted earnings prior to 1980 and after 1991. Tr. at 19.

The ALJ found that inconsistencies between Plaintiff's testimony and Dr. Mehra's records undermined Plaintiff's credibility. The ALJ cited Plaintiff's testimony that he never walked more than a quarter-mile, while Dr. Mehra's records indicated that Plaintiff regularly walked a mile without chest pain or shortness of breath. The ALJ found that Plaintiff's "numerous and severe" complaints at the hearing were rarely reflected in his treatment notes, and that the most recent notes (of January 7, 2003) indicated that Plaintiff was feeling well and had no chest pain. Tr. at 20.

The ALJ acknowledged Plaintiff's episode of congestive heart failure in 2000, but noted that there had been no recurrence of the condition or instance of severe edema. The ALJ noted that at worst, Plaintiff had had 1+ plus edema, and that this was not frequently noted in the medical records. The ALJ found that since the 2000 episode, Plaintiff had not had chest pain, rarely had shortness of breath, his ejection fraction had improved, and his blood pressure was well-controlled. The ALJ also noted that the latest echocardiogram (of March 8, 2002) showed only mild to moderate defects. The ALJ found that Plaintiff failed to comply with prescribed medical treatment by only following his doctor's prescribed diet about fifty percent of the time, and that such a failure to comply was inconsistent with complaints of a disabling condition. Tr. at 20.

The ALJ agreed with Dr. Mehra's assessment that Plaintiff was significantly limited in his ability to stand, walk, and lift; but found that Dr. Mehra exaggerated Plaintiff's condition. Specifically, the ALJ found that Plaintiff's ability to regularly walk a mile without chest pain or shortness of breath was inconsistent with Dr. Mehra's classification of Plaintiff's heart as Class III. The ALJ reiterated the testimony of the ME that Plaintiff's status was more consistent with a functional Class II. In addition, the ALJ found that Dr. Mehra's statement that Plaintiff could not perform activities of daily living did not correspond with the record. The ALJ mentioned a similar observation by the ME. The ALJ then stated that "[a]fter very carefully considering the entire record," the ME testified that there was no medical necessity for Plaintiff to spend two to three hours per working day lying down, or to be absent from work more than twice a month. The ALJ stated that "[f]or these reasons," he did not accept all the limitations described by Dr. Mehra. Tr. at 20-21.

The ALJ determined that Plaintiff had the RFC to walk less than two hours in an eight-hour workday, stand up to two hours at one time, sit up to two hours at one time, and occasionally lift and carry no more than ten pounds. The ALJ did not include a limitation on the total number of hours Plaintiff could sit in an eight-hour workday. Based on this RFC, the ALJ concluded that Plaintiff could not perform his past relevant work. The ALJ noted that if Plaintiff could perform the full range of sedentary work, the Commissioner's Medical-Vocational Guidelines (20 C.F.R., part 404, Subpart P, Appendix 2, Rule 201.22) would direct a finding that Plaintiff was not disabled. The ALJ

noted, however, that because there was a possibility that Plaintiff was not able to perform the full range of sedentary work, it was necessary to consult a VE. Based upon the VE's testimony that a hypothetical individual with Plaintiff's vocational factors, RFC, and other limitations could, in fact, perform certain specified sedentary jobs that existed in significant numbers in the state and national economies, the ALJ held that Plaintiff was not disabled. Tr. at 21.

## <u>STANDARD OF REVIEW AND STATUTORY FRAMEWORK</u>

In reviewing the denial of SSI benefits, the Court must affirm the findings of an ALJ that are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Edwards v. Barnhart</u>, 314 F.3d 964, 966 (8th Cir. 2003). Substantial evidence is less than a preponderance but enough that a reasonable person would find is adequate to support the conclusion. <u>Edwards</u>, 314 F.3d at 966. The Court may not make its own findings of fact or substitute its own judgment for that of the Commissioner. <u>Lochner v. Sullivan</u>, 968 F.2d 725, 727 (8th Cir. 1992). When the Court reviews the record for substantial evidence, it must review the entire record and consider whatever detracts from the weight of the evidence invoked by the ALJ. <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 1998). Reversal, however, is not proper merely because there is evidence that might support an opposite result. <u>Boyd v. Sullivan,</u> 960 F.2d 733, 736 (8th Cir. 1992).

To be entitled to SSI benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. §

423(d)(1)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 214 (2002).  The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.

The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, SSI benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment, or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities, including physical functions, such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; understanding, carrying out and remembering simple instructions; using judgment, responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).

If the claimant's impairment is not severe, the claim is denied.  If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1.  If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any.  If the claimant has past relevant work and is able

to perform it, he is not disabled.  If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors.

Where a claimant cannot perform the full range of work in a particular category of work defined at 20 C.F.R. § 1567 (very heavy, heavy, medium, light, and sedentary) , due to nonexertional impairments, such as pain or mental disorders, the Commissioner must present testimony by a VE to meet her burden at step five.  Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998).

A VE's response to a hypothetical question that includes all of a claimant's impairments and limitations can constitute substantial evidence at step five to support a conclusion of no disability.  Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).  The hypothetical question must capture "the concrete consequences of a plaintiff's deficiencies."  Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997).  The question need not include alleged limitations which the ALJ properly discredits.  Haggard v. Apfel, 175 F.3d 591, 594-95 (8th Cir. 1999).

Here, the ALJ concluded at step two that Plaintiff's cardiac enlargement with a history of congestive heart failure and obesity constituted a severe combination of impairments.  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal a listed impairment.  The ALJ proceeded to step four and assessed an RFC for

Plaintiff. The ALJ correctly noted that because Plaintiff could not perform his past relevant work, the burden shifted to the Commissioner to show at step five that jobs existed in significant numbers in the regional and national economies that Plaintiff could perform. At step five the ALJ concluded, based upon the VE's answers to the ALJ's questions, that the Commissioner met this burden.

## DISCUSSION

### Failure to Fully Credit Treating Physician's Opinion in Determining Plaintiff's RFC

Plaintiff argues that the ALJ improperly failed to give Dr. Mehra's RFC assessment controlling weight, and instead improperly relied on the testimony of a non-examining ME. Plaintiff argues that Dr. Mehra's opinions were based on objective medical evidence and more than 11 examinations since October 2000. The Commissioner argues that because the ALJ properly found that Dr. Mehra's opinion exaggerated Plaintiff's condition and was inconsistent with other substantial evidence in the record, the ALJ was justified in not giving Dr. Mehra's opinion controlling weight.

The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [the] case record." Id. § 404.1527(d)(2). A treating physician's opinion that is inconsistent with the physician's own treatment notes need not be credited by an ALJ. Anderson v. Barnhart, 344 F.3d 809, 813 (8th Cir. 2003); Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).

Here, although the ALJ accepted some of the limitations assessed by Dr. Mehra in the February 26, 2003 RFC questionnaire, the ALJ did not accept Dr. Mehra's opinion with regard to four significant matters: Plaintiff's inability to sit more than four hours in an eight-hour workday, his need to elevate his legs while sitting, his need to lie down for two to three hours every day, and the likelihood of Plaintiff missing more than two workdays per month. The reason given by the ALJ for not accepting these limitations was that they were inconsistent with Dr. Mehra's own records or the medical findings.

The VE testified that the last three limitations noted above would preclude the sedentary jobs he had identified. Clearly, the inability to sit more than four hours in an eight-hour workday would also preclude sedentary work. The record indicates that Dr. Mehra, in the span of a little over two years (October 16, 2000 to January 3, 2003), saw Plaintiff 11 times. In the progress notes documenting those visits, edema was mentioned on four occasions (rather than two, as stated by the ME). The last mention was on July 10, 2002. In his physical examination of Plaintiff on August 15, 2002, Dr. Silvermintz also found edema -- 1+ in both legs from the ankles to the knees.

It is true that Plaintiff's need to elevate his legs while sitting was not mentioned in Dr. Mehra's treatment notes. The notes do mention that Dr. Mehra advised Plaintiff of

dietary modifications that needed to be made, and one might expect that advising Plaintiff of the need to keep his legs elevated while sitting would also have been mentioned in light of Dr. Mehra's opinion expressed on the February 26, 2003 RFC assessment. Fatigue was directly mentioned only once in Dr. Mehra's progress notes -- on February 2, 2001, Dr. Mehra reported that Plaintiff complained of fatigue upon exertion. And Dr. Mehra wrote on numerous occasions that Plaintiff walked one mile per day, and that he was not experiencing chest pain or PND.

Nevertheless, the Court believes that Plaintiff's arguments about the deficiencies in the ALJ's RFC determination have merit. The ALJ's reliance on the ME's testimony to inform his determination is problematic. The ME's testimony reveals that he might not have reviewed the records carefully enough for his opinions to be reliable. The ME specifically stated that he had only been able to review some of the records quickly on the day of the hearing, and other records he reviewed at the hearing itself. The ME stated that the symptoms of marked dysphemia, fatigue, and edema asserted in Dr. Mehra's RFC questionnaire were not recorded in the notes from Plaintiff's office visits. However, each of these symptoms was mentioned in the notes in question. He also misstated to the ALJ that there were only two occasions in which edema was noted. Furthermore, the ME's testimony in response to questioning about Plaintiff's need to elevate his legs while sitting was largely speculative, and the ME testified that he had no way of evaluating Plaintiff's need to lie down two to three hours in an eight-hour workday or the cause of Plaintiff's edema.

Even more problematic is the fact that the ALJ did not mention or offer a basis for discounting Dr. Mehra's opinion that Plaintiff could sit for a total of only four hours in an eight-hour workday. Indeed, the ME testified that this was among Dr. Mehra's restrictions that were reasonable, and the Court has found no evidence in the record to contradict this assessment. See Reeder v. Apfel, 214 F.3d 984, 988 (8th Cir. 2000) (Commissioner's decision reversed and remanded where ALJ did not mention or discredit indications in medical record that plaintiff had limitations in her ability to stand, sit, and lift).

In addition, although the ALJ stated that he considered Plaintiff's obesity at steps two and three of the sequential evaluation process, there is no indication that he considered it in determining Plaintiff's RFC. Obesity was deleted from the Commissioner's listing of impairments, effective October 25, 1999. 64 Fed. Reg. 46122 (1999).[11] Obesity, however, remains a factor to be considered by the ALJ in making a disability determination, and specifically when determining the RFC of a claimant who has cardiovascular impairments. Social Security Ruling 02-01p, 2000 WL 628049, at *7 (Sept. 12, 2002) (when obesity is identified as a medically determinable impairment, functional limitations associated with it must be considered when determining the RFC of claimants with musculoskeletal, respiratory, and cardiovascular problems). An ALJ's

---

[11] Under the old listing for obesity, a man of Plaintiff's height (75 inches without shoes) met listing if he weighed 364 or more and had a history of congestive heart failure. See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 9.09, Table I (1998).

failure to discuss obesity is assessing a claimant's RFC is not necessarily fatal. In <u>Forte v. Barnhart</u>, 377 F.3d 892, 896 (8th Cir. 2004), for example, the court held that the ALJ's failure to consider obesity in determining that the plaintiff could perform sedentary work that would allow alternate sitting and standing, did not warrant reversal where the plaintiff's treating physician repeatedly reported that the plaintiff was obese, but nonetheless believed he could perform light work. Here, however, Plaintiff's treating physician did not believe Plaintiff could do light, or even sedentary work.

**Hypothetical Question Posed to the VE**

Plaintiff argues that the ALJ erred by relying on the response to a faulty hypothetical question, which failed to properly take into account Plaintiff's limitations and impairments, including his edema and obesity. As noted above, the hypothetical posed to the VE did not include an inability to sit more than four hours in an eight-hour workday, the need to elevate one's legs while sitting, the need to lie down two to three hours a day, and the likelihood of missing more than two days a month. The Commissioner argues that the ALJ properly omitted from the hypothetical question the "exaggerated and unsupported limitations" noted by Dr. Mehra; that the RFC determined by the ALJ "appears to" account for Plaintiff's edema and obesity, and that from the wording of the ALJ's hypothetical question, the VE would have understood that the ALJ meant to include the requirement that any possible job have a sit/stand option.

In order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a VE must be in response to a hypothetical question which "captures the

concrete consequences of the claimant's deficiencies." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). The question need not include alleged limitations which the ALJ properly discredits. Randolph v. Barnhart, 386 F.3d 835, 841 (8th Cir. 2004) (because the ALJ properly determined that the plaintiff's alleged psychological limitations were not supported by the record, the ALJ was not required to include such limitations in the hypothetical posed to the VE); Goose v. Apfel, 238 F.3d 981, 985 (8th Cir. 2001).

Here, in light of the discussion above, the Court concludes that the VE's testimony that Plaintiff could perform sedentary work does not constitute substantial evidence in support of the ALJ's determination that Plaintiff is not disabled. The Commissioner's argument that the VE would have understood that the ALJ meant for him to limit his consideration to jobs that offered a sit/stand option is unpersuasive. Nor is it evident that the jobs identified by the VE (order clerk, credit card clerk, customer service representative, general office worker, or telephone salesperson) would include such an option. Cf. Forte, 377 F.3d at 892 (where plaintiff's impairments, including obesity resulted in marked restrictions in bending, lifting, stooping, and prolonged standing and sitting, hypothetical posed to VE was proper where it directed the VE to limit his consideration to jobs which would have a sit/stand option); Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (same).

## <u>CONCLUSION</u>

The ALJ's decision that Plaintiff is not disabled is not supported by substantial evidence in the record as a whole. The case must be remanded for further proceedings, which may include an examination of Plaintiff by a medical consultant and/or testimony by a VE based upon a fair presentation of Plaintiff's impairments.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED,** and that this case is **REMANDED** for further consideration.

An appropriate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 22nd day of March, 2006